[Nos. 28992, 29001.   Department One.   June 17, 1943.]

JOHN C. WICKLUND *et al., Respondents,* v. THE
COMMISSIONER OF UNEMPLOYMENT
COMPENSATION, *Appellant.*

COLUMBUS B. GROVES *et al., Respondents,* v. THE
COMMISSIONER OF UNEMPLOYMENT
COMPENSATION, *Appellant.*[1]

[1]Reported in 138 P. (2d) 876.

*The Attorney General, George W. Wilkins,* and *Frank W. Foley, Assistants,* for appellants.

*F. L. Morgan,* for respondents.

MILLARD, J.—John C. Wicklund and thirty-three other persons employed as trainmen (locomotive engineers, locomotive firemen, and brakemen) by the Polson Logging Company and Ozette Railway Company (a single employer) filed claims for benefits under the unemployment compensation act for the period of September 29, 1941, through November 15, 1941, which were allowed by the unemployment compensation division. On appeal of the employer to the appeal tribunal of the unemployment compensation and placement division, the original determination was reversed and benefits were denied to the claimants, and the findings of fact and conclusions of the appeal tribunal were affirmed by the commissioner of unemployment compensation and placement. The claimants appealed to the superior court for Grays Harbor county, which

found that the claimants were not participating in the controversy and that the only question involved was their right to refuse to join a striking union which did not have a contract for a closed shop with the employer; that instead of receiving benefits the claimants were to be required to pay dues, and, in the final analysis, submit to a loss at least to the extent of the initiation fees and dues demanded of them by the striking union. The court further found that the question presented is one of first impression in this state, involving many important questions of law concerning the construction of the unemployment compensation act, and, in view of the amount of legal effort required, that six hundred eighty dollars is a reasonable attorney fee to be allowed to the attorney for the claimants. The trial court concluded that the commissioner incorrectly construed the law upon the conceded facts in disqualifying the claimants and entered an order reversing the decision of the commissioner, who appealed.

It is the position of appellant that the unemployment of respondents was caused by a stoppage of work which existed because of a labor dispute; that, unless the record discloses that the claimants showed conclusively that they were not directly interested in the labor dispute which caused the stoppage of work, and that they did not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurred, any of whom were participating in or financing or directly interested in the dispute, the commissioner's finding to the contrary must be sustained, inasmuch as under the statute (Rem. Rev. Stat. (Sup.), § 9998-106 [P. C. § 6233-306]) the question whether the claimants met the requirements of the statute (subsections 1 and 2 of Rem. Rev. Stat. (Sup.), § 9998-105 [P. C. § 6233-305] (e) ) in this regard is one for determination by the commissioner, whose findings and decision are conclusive. Rem. Rev.

Stat. (Sup.), § 9998-105, so far as pertinent, reads as follows:

"An individual shall be disqualified for benefits:

"(e) For any week with respect to which the commissioner finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this sub-section shall not apply if it is shown to the satisfaction of the commissioner that:

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: *Provided,* That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises."

Respondents argue that they were not "participating in or financing or directly interested in the labor dispute which caused the stoppage of work"; and that they did not belong to a grade or class of workers described in subsection 2 of Rem. Rev. Stat. (Sup.), § 9998-105 (e), quoted above.

The appeal tribunal of the division of unemployment compensation made findings of fact which are summarized as follows: September 16, 1941, the membership of Local 3-2 of the Sawmill & Timber Workers' Union of the International Woodworkers of America, which was recognized by respondents' employer (Polson Logging Company and Ozette Railway Company) and the National Labor Relations Board as the exclusive bargaining agency for all of the employees of the logging company and railway company, except for

boommen and certain others not involved, attempted to compel all trainmen (respondent claimants) to take out membership in Local 3-2, and decided that they would refuse to load logs on railroad cars brought to them by nonmembers of union Local 3-2. The primary duties of respondents consisted of transporting logs from the various company camps to the booming grounds of the employer on the Hoquiam river. The railroad operated by respondents does no hauling other than in connection with the employer's logging operations.

Respondent trainmen were not members of Local 3-2, but were members of union groups designated as the railway brotherhoods. September 18, 1941, respondents received notice, as follows, from Local 3-2 that they were considered eligible for membership in Local 3-2 and that they should make immediate application for membership.

"You are hereby notified that all persons eligible for membership in the Sawmill & Timber Workers Union, Local 3-2, I. W. A., the certified collective bargaining agent for the employees of the Polson Logging Company and/or the Ozette Railway Company, shall make immediate application to become members of this Union.

"From this date up to and including Friday, September 26th, 1941 all applications for membership will be considered when accompanied by the usual initiation fee of $10.00. This amount includes the current month's dues of $1.00.

"Membership in this union on the terms hereinabove proposed is open to all employees otherwise eligible irrespective of present or former union affiliations."

Respondent trainmen, whose several petitions that the brotherhoods be acknowledged as appropriate bargaining units separate from that of the loggers had been denied by the National Labor Relations Board, refused to comply with the demand of Local 3-2, and as a result the members of Local 3-2 refused, commencing September 29, 1941, to load logs on cars

handled by the trainmen. The trainmen were at all times willing and anxious to continue working under conditions existing at the time Local 3-2 called the strike. They reported for work as long as work was available, but it was impossible under the conditions obtaining—refusal of members of Local 3-2 to load logs on cars handled by respondents so long as they failed to comply with demand to join Local 3-2; hence, log production was suspended and respondents were unemployed from September 29, 1941, to and including November 15, 1941. Respondents surrendered November 15, 1941, and joined Local 3-2. The logging company and railway company resumed normal operations November 17, 1941.

The appeal tribunal further found that, except for the change in the union affiliation of the trainmen, all employees returned to work under working conditions which were the same as those existing prior to September 29, 1941, when the members of Local 3-2 refused to load logs on cars handled by respondent trainmen who were not members of Local 3-2.

The appeal examiner stated that it was safe to say that respondents were not participating in, nor were they financing, the labor dispute which caused the work stoppage; that, assuming, without deciding, that respondents were of a separate grade or class of workers (described in subsection 2 of Rem. Rev. Stat. (Sup.), § 9998-105 (e), quoted above), the sole question for determination was whether respondents were "directly interested" in the labor dispute. The commissioner affirmed the examiner's conclusion that, as membership or nonmembership in a particular union is just as much a part of "working conditions" as are wages and hours, the respondent trainmen's working conditions were subject to change by the outcome of the dispute whether they could be compelled to join Local 3-2 (change of union affiliation from brotherhood to Local 3-2); therefore, they were directly interested in that dispute; hence, are disqualified for benefits.

Concededly, there was a stoppage of work which existed because of a labor dispute (strike called by members of one union because members of another union working for the same employer would not become members of the striking union) initiated by members of Local 3-2, and the only question presented by the findings of appellant commissioner is whether respondents were "directly interested" in that labor dispute, within contemplation of the statute (Rem. Rev. Stat. (Sup.), § 9998-105 (e) ).

While, under the statute (Rem. Rev. Stat. (Sup.), § 9998-106), the factual findings of the commissioner of unemployment compensation must not be disturbed upon appeal, unless there is an absence of substantial evidence upon which to base those findings, it is the function of the court on appeal to determine whether the commissioner "has correctly construed the law, . . ." *In re St. Paul & Tacoma Lbr. Co.,* 7 Wn. (2d) 580, 110 P. (2d) 877.

In the preamble (Rem. Rev. Stat. (Sup.), § 9998-102 [P. C. § 6233-302]) of the unemployment compensation act is a declaration of policy, which is to prevent the spread, and to lighten the burden, of involuntary employment which so often falls with crushing force upon the unemployed worker and his family, and, to effectuate the purpose of reducing unemployment to the minimum, the act shall be liberally construed.

In Rem. Rev. Stat. (Sup.), § 9998-105 (d) subsections 1 and 2, the policy of the act to protect workers involuntarily unemployed is further emphasized. That section provides that one who has left work voluntarily or has been discharged for misconduct shall be disqualified for benefits during the period of his unemployment and such disqualification shall continue until he has accepted suitable work when offered him or returned to his customary self-employment, if any, when so directed by the commissioner. In determining whether the work is suitable for the unemployed individual, the statute provides that, among other things,

no work shall be deemed suitable if the position offered is vacant due directly to a strike, walkout, or other labor dispute, or if, as a condition of being employed, the individual would be *required* to join a company union or *to resign from*, or refrain from joining, *any bona fide labor organization*.

Under Rem. Rev. Stat. (Sup.), § 9998-105 (e) subsections 1 and 2, if his unemployment is due to a stoppage of work which exists because of a labor dispute at the establishment or other premises at which he "is or was last employed," he is disqualified for benefits if he participated in, financed, or was directly interested in the labor dispute which caused the stoppage of work. He is also required to show, to entitle him to benefits, that he did not belong to a grade or class of workers of which, immediately prior to the commencement of the stoppage of work, there were members employed at the premises at which the stoppage occurred, any of whom were participating in, or financing, or directly interested in the labor dispute. The section further provides, with reference to unemployment because of stoppage of work by reason of a labor dispute, that, where separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises.

There is no language in the unemployment compensation act which even infers that the legislature contemplated requiring, as a condition precedent to the right to work, or as a condition prerequisite to the right to unemployment compensation, that the claimant for benefits be a member of any union, refrain from joining any labor organization, or resign from or transfer his allegiance from one labor organization to another labor organization.

It is our function upon this appeal, accepting as verities the findings of the commissioner, to determine

whether the commissioner correctly construed the law applicable to those facts. The commissioner found, in effect, that, by reason of refusal of respondent trainmen to pay an initiation fee of ten dollars and monthly dues thereafter of one dollar to Local 3-2, I.W.A., and thereby become members of that union, Local 3-2 called a strike, which resulted in involuntary unemployment of respondents who were ready and willing at all times during the strike to continue working; that, except for the change in union affiliation of the trainmen by their acceding to the demand of Local 3-2 that the trainmen join that union, all employees (including respondent trainmen, boommen, loggers, and others) returned to work under working conditions which were the same as those existing prior to September 29, 1941, when Local 3-2 called the strike or compelled the stoppage of work.

The argument that respondents, by becoming members of Local 3-2, would be in a position to bargain with their employer in regard to working conditions and thereby were *directly interested* in the dispute, in that its outcome governed whether they would be represented by a union in which they had no voice or be represented by a union of which they were members and thus would have a voice, is not sound. The words "directly interested in the labor dispute" are clearly limited in their application to those employees directly interested in furtherance of the dispute by participation and activity therein.

While membership in a striking union and recognition of the existence of a strike by workers in obtaining permits from a striking union to work were held sufficient to disqualify claimants for unemployment compensation in *In re St. Paul & Tacoma Lbr. Co., supra*, we are not yet committed to the rule that the refusal to change affiliation from one union to another union, which calls a strike because of such refusal, disqualifies for unemployment compensation members of the first union if they are ready and willing to work

during the period of the strike. The refusal of nonunion members to pass a picket line established by a union disqualified those nonunion members for unemployment compensation in *In re St. Paul & Tacoma Lbr. Co., supra,* as such refusal was an active and effective participation in the labor dispute. The refusal to pass through picket lines because contrary to union convictions does not constitute an involuntary refusal, inasmuch as all who desire to work have a legal right to pass through a picket line and be protected in so doing.

There is no evidence of any labor dispute between the employer and respondent trainmen, nor is there any evidence that, within contemplation of the statute, respondent trainmen were directly interested in the labor dispute initiated and continued by Local 3-2 until that union compelled respondents, who were members of another independent union, to join Local 3-2. We repeat that respondents were not *directly interested* in the furtherance (they desired its cessation) of the dispute by participation and activity therein, and, except for the change in union affiliation of respondent trainmen as a result of the dispute, there was no change in the conditions of work in which respondents were engaged.

█ The fact that Local 3-2 was designated as a bargaining agent in nowise affects the rights of claimants as individuals. 29 U. S. C. A., § 159, which defines the rights, duties, and powers of a bargaining agent, lends no support to the position of appellant. Such agency is dependent upon and is confined to labor union activities solely, and such agency speaks only for "such unit for the purposes of collective bargaining in respect to rates of pay, . . . or other conditions of employment: . . ."

It is clear from an examination of the statute (29 U. S. C. A., § 159) that such bargaining agency is not an agent for such employees as do not choose to become a part of it. The statute specifically provides that *any*

*individual employee or a group of employees shall have the right at any time to present grievances to their employer.* The statute does not contemplate the creation of an involuntary agency for a workman who refuses to become a member of such union agency, or who refuses to join any union. That statute does not, nor does any other valid statute of which we are aware, require, as a condition precedent to the right to work or the right to unemployment compensation, that one become, or refrain from becoming, a member of any union, or change affiliation from one labor union to another labor union.

*Chrysler Corp. v. Smith,* 297 Mich. 438, 298 N. W. 87, 135 A. L. R. 900, which held that a labor dispute which affects the wages, hours of work, and general conditions of employment, causes all employees concerned to be directly interested within the meaning of the statute, is, patently, inapt. *Huiet v. Boyd,* 64 Ga. App. 564, 13 S. E. (2d) 863, is also distinguishable, on the facts, from the case at bar. It appeared in that case that, if the strike which caused the stoppage of work had been successful, the claimants would have received an increase of wages; hence, the court said:

" . . . they were directly interested in the dispute which caused the stoppage of work at the establishment where they were employed and they were 'disqualified for benefits.' "

*Huiet v. Boyd, supra,* refused to follow *Kieckhefer Container Co. v. Unemployment Compensation Commission,* 125 N. J. L. 52, 13 A. (2d) 646, which held that the fact that an employee, who did not participate in or finance labor dispute which caused cessation of work, would benefit by agreement between employer and striking union as to wages, did not make him, under the provisions of a statute in all material respects the same as ours, an employee "directly interested in the labor dispute" so as to be disqualified for unemployment benefits, since the quoted words clearly limit their

application to those employees directly interested in furtherance of the dispute by participation and activity therein. The supreme court of New Jersey said:

"As to the first phase, namely, participation in or financing of the dispute, the testimony is clear and uncontradicted that Bowen took no part therein. Prosecutor insists that, inasmuch as he would benefit by the agreement entered into between the employer and the labor unions representing the striking employes, by the limitation of working hours, increase of pay for overtime work and temporary assignment to higher paid jobs, pay for reporting for work when there was no work to do, a vacation with pay, and concessions with regard to handling grievances and regulating and limiting discharges, he was directly interested in the labor dispute above mentioned.

"The argument is that, inasmuch as every employe was interested in the improvement of his working conditions, rate of pay and other matters related to his employment, therefore, each employe was 'directly interested in the labor dispute which caused the stoppage of work.' We conclude that this is a strained interpretation of the statute. The clear meaning of the language is to confine disqualification to those who are creating the dispute or participating therein in order to enforce their demands. To accept the prosecutor's construction would render every employe of a business, some of whose employes went on strike, ineligible for benefits, notwithstanding his non-participation therein and even though he might be opposed to the labor dispute and decline to have any part therein. The use of the words 'directly interested in the labor dispute' clearly limits their application to those employes directly interested in its furtherance by participation and activity therein."

In *Department of Industrial Relations v. Drummond,* 30 Ala. App. 78, 1 So. (2d) 395, the court of appeals of Alabama held, under a statute like our unemployment compensation statute, that one who becomes involuntarily unemployed by reason of a labor dispute which he opposes and is powerless to avert may not be denied unemployment compensation. The court said:

"True, the origin of the disaffection may have been the trade dispute or disagreement between the employer and the United Mine Workers of America, but to us the conclusion is inescapable that the Legislature never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a 'labor dispute' in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert. To conclude otherwise, it appears to this court, would be to defeat the true and beneficent purposes of the statute and convert that statute into a sham and a mockery with respect to those industrial employees, as appellee, whom it must have been designed to protect against the hazards of enforced unemployment, the causes of which they were helpless to avoid. If such were not so, then a situation could be conceived and easily executed whereby a few persons could accomplish the unemployment of hundreds of innocent victims, entirely faultless in the matter, and thereby deprive them of compensation benefits which they had bought and paid for.

"The evident and well recognized purpose of the Alabama Unemployment Compensation Law, harmonious and responsive to the Social Security Legislation of the National Congress, was to insure the diligent worker against the vicissitudes of enforced unemployment, whether he be from office or shop, union or nonunion. Certainly, if he can be rendered ineligible for benefits under the Act by such unemployment, precipitated by some other agency to which he owes no allegiance and in whose purposes he is in no way concerned, the prime objective of the Act would be defeated. It would be insurance which does not insure, protection which does not protect, and to such workers, many of whom are economically unable to stand the rigors of enforced idleness, this statute would 'become as sounding brass, or a tinkling cymbal.' Such could not be the purpose or policy of the statute, if due and fair consideration is to be accorded those whose wages or earnings were contributed (to the trust fund created in the Act), for the supposed purpose of purchasing insurance against the evil day of their involuntary idleness."

■ The commissioner assumed, without deciding, that the trainmen were of a separate grade or class of workers and were not within the purview of Rem. Rev. Stat. (Sup.), § 9998-105 (e) (2); and that the only question for the determination of the commission, which was the only question before the trial court and the only question presented by this appeal, was whether respondents were directly interested in the labor dispute which caused the stoppage of work. The trial court correctly decided that respondents were not, under the facts found by the commissioner, "directly interested" in the labor dispute which caused the stoppage of work.

The facts in the second case (29001) which was consolidated on appeal with case No. 28992, are as follows: Columbus B. Groves and twenty-six other trainmen, who are employees of Polson Logging Company and Ozette Railway Company, are members of either the Brotherhood of Locomotive Firemen and Enginemen or the Brotherhood of Railroad Trainmen, which are independent labor organizations in no way connected with Local 3-2 of International Woodworkers of America, which is recognized by the employer (Polson Logging Company and Ozette Railway Company) as the bargaining representative of the trainmen and the members of Local 3-2.

May 12, 1941, Local 3-2, having previously made demands on the employer for wage increases, vacations with pay, and a union shop, called a strike which resulted in suspension of all operations until June 16, 1941. In a working agreement dated December 20, 1940, the employer recognized Local 3-2 as the bargaining agency. As recited above in the first case, petitions filed by the trainmen seeking to be recognized as a bargaining unit were dismissed by the National Labor Relations Board. It is conceded that Local 3-2 is not the bargaining agency for boommen and certain other employees not involved in this case.

The twenty-seven trainmen were not in sympathy with the strike called by Local 3-2, and they reported for work during the strike period but were "laid off" because no loggers were available to load the cars. Pursuant to agreement executed June 16, 1941, between the employer and Local 3-2, the strike was "called off" and operations resumed June 17, 1941. The concessions granted by the employer in that agreement accrued to the benefit of the trainmen, boommen, and all other employees as well as to members of Local 3-2.

The claims of the twenty-seven trainmen for benefits under the unemployment compensation act from May 12, 1941, through June 16, 1941, the period of their unemployment because of the strike called by Local 3-2, during all of which time the trainmen reported for work and evinced their willingness to work despite the action of Local 3-2, were denied.

The appeal examiner of the division of unemployment compensation and placement concluded that the trainmen were directly interested in a labor dispute as their wages and conditions of employment were involved in a strike called by a union having the legal right to bargain in their behalf, and that it was immaterial, where it is shown that the striking union has that right, that none of the trainmen had a voice in the conduct of the union's affairs; therefore, under the provisions of Rem. Rev. Stat. (Sup.), § 9998-105 (e) (1), the trainmen were disqualified for benefits. The examiner concluded that the trainmen were disqualified for benefits under the provisions of Rem. Rev. Stat. (Sup.), § 9998-105 (e) (2), which requires the worker to show, as a condition precedent to his right to benefits, that he was of a separate grade or class from all those involved in the dispute. The commissioner affirmed the findings and conclusions of the appeal examiner, from which decision the trainmen appealed to the superior court for Grays Harbor county, which found that the concessions granted by the employer in

the agreement of June 17, 1941, between it and Local 3-2, were automatically applied by the employer to all of its employees, including trainmen, members of Local 3-2, and other employees for whom concededly Local 3-2 was not the bargaining agency, which were the only benefits of any kind which the trainmen can be said to have received.

The trial court court concluded that the claimants were not participating in nor financing nor, within the contemplation of the statute, directly interested in the labor dispute which caused the stoppage of work; that in their work as trainmen the claimants were operating a special branch of work which was conducted as a separate business or department, and that the claimants did not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurred, any of whom were participating in or financing or directly interested in the dispute.

In view of the fact that this was a case of first impression requiring extensive legal study, the court concluded that five hundred forty dollars would be a reasonable attorney's fee. Judgment was entered remanding the cause to the commissioner for reconsideration of the claims and payment of allowances in conformity to the foregoing; and that the attorney for claimants be allowed a fee of six hundred eighty dollars. This portion of the judgment is obviously erroneous as in the first case involving thirty-four claims the allowance was in the amount of twenty dollars for each claim, or an aggregate of six hundred eighty dollars; and in this case the court concluded that the attorney's fee should be twenty dollars for each of the twenty-seven claims or a total of five hundred forty dollars. The commissioner appealed.

In this second case, as in the first case, the first question is whether respondents were directly inter-

ested in the labor dispute which caused the stoppage of work.

The mere fact that respondents were concerned respecting any desired improvement of their working conditions, rate of pay, and other matters related to their employment as trainmen, and, assuming that certain concessions received by the members of Local 3-2, as a result of an agreement between Local 3-2 and the employer, which the employer automatically applied to all of its employees, including respondent trainmen and the boommen, it does not follow. that, because of the receipt of those benefits, respondents were "directly interested" in the labor dispute which caused the stoppage of work. As we stated in the first case, the words "directly interested" are limited in their application to those employees directly interested in furtherance of the labor dispute by participation and activity therein. The legislature never intended that unemployment compensation should be denied to employees because of a labor dispute which they did not initiate or further, the cause of which unemployment they and their independent labor organization were powerless to avert.

The interpretation given by the New Jersey supreme court in *Kieckhefer Container Co. v. Unemployment Compensation Commission, supra,* of an unemployment compensation statute, which differs in no material particular from our unemployment compensation statute, we adopt. That court aptly observed that the clear meaning of the language of the statute is to confine disqualification to those who are creating the dispute, or participating therein in order to enforce their demands. It would be a forced interpretation to hold that the use of the words "directly interested in the labor dispute" did not limit the application of those words to those employees directly interested in the furtherance of the labor dispute by participation and activity therein. See *Department of Industrial Relations v. Drummond,* 30 Ala. App. 78, 1 So. (2d) 395.

None of the respondents belonged to a grade or class of workers of which, immediately prior to the commencement of the stoppage, "there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute." Rem. Rev. Stat. (Sup.), § 9998-105 (e) (2).

It is clear from the record that the railroad department in which respondent trainmen were employed was a separate branch of work which is commonly conducted as a separate business in separate premises and thus to be deemed a separate establishment, as the commissioner found the boommen to be. The railroad department was a separate department in which there was no labor dispute. The "sit-down" strike was in the woods at the end of the line, and was initiated and furthered by members of Local 3-2 solely. With the highly skilled craft of operating the trains the loggers had nothing whatsoever to do. On the other hand, the trainmen had no part in the work of logging, which we may concede is also a skilled operation. While a man might become skilled as a trainman and also as a logger, he would work either at one craft or the other but never as a trainman and as a logger simultaneously. The work of the logger is in one department and the operation of the trains is another department of the employer's business. The trial court correctly decided that respondents were entitled, under the undisputed facts, to unemployment compensation.

█ The trial court allowed an attorney's fee of six hundred eighty dollars in each case. The questions presented are of first impression in this court, but the study and work required in the preparation of the one case include both cases, which were consolidated on appeal, as practically the same questions are involved in both; therefore, an attorney's fee of seven hundred fifty dollars is allowed for the consolidated cases.

Except for the reduction of the attorney's fee, the judgments are affirmed.

SIMPSON, C. J., STEINERT, JEFFERS, and MALLERY, JJ., concur.

September 14, 1943. Petition for rehearing denied.