GILMORE CONSTRUCTION COMPANY, APPELLANT, V.
MARVIN D. MILLER AND JOHN HANLON, COMMISSIONER
OF LABOR, APPELLEES.

327 N.W.2d 628

Filed December 17, 1982. No. 82-214.

134

Dean G. Kratz of McGrath, North, O'Malley & Kratz, P.C., for appellant.

Pamela A. Mattson, for appellee Hanlon.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

KRIVOSHA, C.J.

The appellant, Gilmore Construction Company, appeals from a judgment of the District Court for Douglas County, Nebraska, upholding a decision of the Nebraska Appeal Tribunal, a part of the Nebraska State Department of Labor. The appeal tribunal found that the employee, Marvin D. Miller, was not disqualified from receiving unemployment compensation benefits by reason of being involved in a labor dispute. We believe that the trial court was correct in its decision and therefore affirm the trial court.

Miller is a member of Cement Masons Local No. 538 and was employed by Gilmore Construction Company on a project called "Financial Plaza" located in the city of Omaha, Nebraska. On June 4, 1980, a strike was called by the Omaha carpenters union against contractors in Omaha, Nebraska, including Gilmore. On the first day of the strike, Miller reported to the jobsite and spoke to his foreman. According to Miller, he was told that the equipment necessary to perform the work had been removed by Gilmore and that Miller therefore would be called back to work as "soon as they got it settled." The cement masons did not go on strike in sympathy with the carpenters, and, in fact, after their separate contract expired they worked without a contract until a settlement of the contract for the cement masons was reached. Miller testified that as a cement mason he did not stand to gain or lose in any way by the outcome of the carpenters' strike or the ironworkers' strike because the cement masons

had a separate contract with the employers. Miller further testified that he did not in any way participate in the strike of the carpenters or the ironworkers, nor did he in any way finance the strike of the carpenters or the ironworkers. This testimony, as given by Miller, was not refuted.

The Employment Security Law of Nebraska contains a specific provision regarding claims for benefits filed as a result of a labor dispute. Neb. Rev. Stat. § 48-628(d) (Reissue 1978) provides that an employee shall be denied unemployment benefits "(d) For any week with respect to which the commissioner finds that his total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; *Provided,* that this subdivision shall not apply if it is shown to the satisfaction of the commissioner that (1) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work, and (2) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating, financing, or directly interested in the dispute . . . ."

Gilmore points out to us that in the case of *A. Borchman Sons v. Carpenter,* 166 Neb. 322, 328, 89 N.W.2d 123, 127 (1958), we denied unemployment compensation to a member of a union not a member of the striking union on the basis that " ' "a labor dispute that affects the wages, hours of work, and general conditions of employment, causes all employees concerned to be directly interested." ' " Furthermore, in *Borchman* we held, as a matter of law, that the disqualification rule "applies to members of unions who do not strike and to nonunion employees." (Syllabus of the court.)

While there is a split of authority among jurisdictions on this point, we believe that the better-

reasoned cases would reach a conclusion contrary to that which we declared in *Borchman* and therefore would cause us to overrule our previous decision, thereby bringing about the result urged by the Commissioner of Labor. It appears to us that the rationale of *Borchman,* as pointed out by the commissioner, effectively repeals the exemptions contained in § 48-628(d) and brings about just the opposite result intended for by the Legislature. See Annot., 62 A.L.R.3d 380 (1975).

The evidence is undisputed that work stoppage in the first instance was because of a labor dispute. Therefore, in order for Miller to become ''requalified,'' he must show that he was not participating in or financing or directly interested in the labor dispute which caused the stoppage of work *and* that he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, financing, or directly interested in the dispute.

The evidence, as presented, established without dispute that Miller was not participating in or financing the labor dispute and did not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members who were participating in or financing the dispute. Miller's disqualification could only come about if we were to hold, as we did in *Borchman,* that because Miller was a member of a union, having a contract with the employer, and might indirectly benefit from the strike, he thereby had a ''direct interest'' in the dispute. The cases from other jurisdictions which have carefully examined the specific language contained in § 48-628(d) and found to the contrary are persuasive. In the case of *Outboard, Marine & Mfg. Co. v. Gordon,* 403 Ill. 523, 536-37, 87 N.E.2d 610, 617 (1949), the Illinois Supreme Court, in reviewing a statute identical to the one in

question, said: "The conclusion is unescapable that the legislature intended to provide for the innocent victims of a labor dispute by specifically excluding them from the denial of unemployment compensation. The previously quoted subsection of section 7 of the Illinois Act was meant to protect and except such victims from the classes denied compensation by its terms. Those who were to be excluded from benefits by the statute were those who attempted to gain by conduct which caused their unemployment or those who actively aided or abetted the previous group, whether or not they gained or lost. A proximity of conduct aiding or abetting the strikers or proximity of result to be gained from the dispute were meant to be the measuring factors. The legislature did not intend to bar, because of remote claims of causation or result, those who were deprived of their employment from the benefits to be received under the act."

And in *Shell Oil Co. v. Cummins,* 7 Ill. 2d 329, 336-37, 131 N.E.2d 64, 68 (1955), the Illinois Supreme Court again, in reviewing the identical statute, said: "The appellant next contends that the 12 craft unions, all members of the same Trades Council, by jointly negotiating with the Company for a single working agreement had placed all their members in the same 'grade or class' so that a strike by one would cause the ineligibility of all. In support thereof, it cites *Brown Shoe Co. v. Gordon,* 405 Ill. 384 [91 N.E.2d 381 (1950)], and *Local No. 658, Boot and Shoe Workers Union v. Brown Shoe Co.,* 403 Ill. 484 [87 N.E.2d 625 (1949)]. In these cases, all production and maintenance workers were members of and represented by the same union local. In both instances, although a new contract had been negotiated by this union and approved by its members, certain workers employed in the lasting department refused to abide thereby, resulting in the involuntary unemployment of other members. We held, upon these facts, that the claimants were of the same

grade and class as the striking bedlasters, and for that reason, denied unemployment compensation benefits. The same reasoning, however, will not apply in the present case. Here we are dealing not with one but with 12 different unions and with 12 different bargaining agents. Although it was customary for these unions to jointly negotiate with the employer and to have the resulting agreement embodied in a single document, yet there was in fact a separate contract existing between the Company and each of the 12 individual unions which, to be effective, required only the ratification of the particular union concerned. This is shown by the fact that in the present case, even though ten unions ratified the agreement, two others were free not only to reject these terms but also to take independent steps to enforce their demands." The Illinois court recognized that while there was some commonality between the unions, there was still independence, and therefore, in effect, it was inappropriate to suggest that each union was directly involved with the other.

In *Ancheta v. Daly,* 77 Wash. 2d 255, 264-65, 461 P.2d 531, 537 (1969), the Washington Supreme Court, reviewing a similar statute, said: " 'The words "directly interested in the labor dispute" are clearly limited in their application to those employees directly interested in furtherance of the dispute by participation and activity therein.' [Citation omitted.] Although there are some shortcomings in this definition of 'directly interested,' we believe that there was no direct interest by the claimants based both upon the lack of participation by the claimants coupled with a recognition that the minimal penny an hour wage increase was in no real sense an economic benefit when compared with the long period during which the claimants were out of work. We are convinced that the claimants were within the relief provisions of RCW 50.20.090 and are entitled to unemployment benefits."

And, finally, in *Wicklund v. Commissioner,* 18

Wash. 2d 206, 217-18, 138 P.2d 876, 882 (1943), the Washington Supreme Court said: " 'The argument is that, inasmuch as every employee was interested in the improvement of his working conditions, rate of pay and other matters related to his employment, therefore, each employee was "directly interested in the labor dispute which caused the stoppage of work." We conclude that this is a strained interpretation of the statute. The clear meaning of the language is to confine disqualification to those who are creating the dispute or participating therein in order to enforce their demands. To accept the prosecutor's construction would render every employe of a business, some of whose employes went on strike, ineligible for benefits, notwithstanding his non-participation therein and even though he might be opposed to the labor dispute and decline to have any part therein. The use of the words "directly interested in the labor dispute" clearly limits their application to those employes directly interested in its furtherance by participation and activity therein.'

. . . .

" '. . . [T]he conclusion is inescapable that the Legislature never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a "labor dispute" in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert. To conclude otherwise, it appears to this court, would be to defeat the true and beneficent purposes of the statute and convert that statute into a sham and a mockery with respect to those industrial employees, as appellee, whom it must have been designed to protect against the hazards of enforced unemployment, the causes of which they were helpless to avoid. If such were not so, then a situation could be conceived and easily executed whereby a few persons could accomplish the unemployment of hundreds of innocent victims, entirely faultless in the

matter, and thereby deprive them of compensation benefits which they had bought and paid for.' ''

It would have been very easy for the Legislature to draft a statute which would produce the result urged by Gilmore and reached by us in *Borchman.* We must, however, believe that by using the word "direct," the Legislature did not mean to exempt persons "indirectly affected" by a strike called by another union. To hold, as *Borchman* did, that "directly interested" includes not only members of the union and others directly involved but also members who do not strike and nonunion employees who have no control over the strike or the work stoppage is to effectively repeal § 48-628(d). If that is to be done, it should be done by the Legislature and not by the courts.

We believe that to the extent the holding in *Borchman* is understood to provide that both members of nonstriking unions and nonunion employees who may ultimately benefit by reason of a strike called by another union are disqualified from receiving unemployment compensation benefits under the provisions of § 48-628(d), even though they are not directly involved in the work stoppage, it is overruled. The better rule is that members of nonstriking unions and nonunion employees who are not participating in or financing or directly interested in a labor dispute which caused a work stoppage, and who do not belong to a grade or class of workers who, immediately before the commencement of the stoppage, were members employed at the premises at which the stoppage occurs and are participating in or financing or directly interested in the labor dispute, are not disqualified from receiving benefits under § 48-628(d).

We believe that both the Nebraska Appeal Tribunal and the District Court were correct in finding that Miller had met his burden of proving he was within the exceptions of § 48-628(d) and was not disqualified, by reason of the labor dispute, from re-

ceiving unemployment compensation, and we therefore affirm the decision of the District Court which upheld the determination of the Nebraska Appeal Tribunal.

AFFIRMED.

CAPORALE, J., dissenting.

I respectfully dissent. In doing so, I concede that the majority's analysis in this case employs a logical method in defining the phrase "directly interested," as used in Neb. Rev. Stat. § 48-628(d) (Reissue 1978). My difficulty arises from the fact that the question is not an open one; this court in *A. Borchman Sons v. Carpenter,* 166 Neb. 322, 89 N.W.2d 123 (1958), adopted a contrary definition by an equally logical analysis.

For almost 25 years the law in this jurisdiction has been that nonstriking union members are "directly interested" in a work stoppage produced at their place of employment by another union. During this period the Legislature has seen fit to allow our prior construction of its statute to stand. Where a statute has been judicially construed and that construction has not evoked an amendment, it will be presumed that the Legislature has acquiesced in the court's expository analysis of the legislative intent. *The People v. Hairston,* 46 Ill. 2d 348, 263 N.E.2d 840 (1970), *cert. denied* 402 U.S. 972, 91 S. Ct. 1658, 29 L. Ed. 2d 136 (1971); *Santanelli v. City of Providence,* 105 R.I. 208, 250 A.2d 849 (1969); *Nevada Indus. Comm'n v. Strange,* 84 Nev. 153, 437 P.2d 873 (1968); *Hewett v. Garrett,* 274 N.C. 356, 163 S.E.2d 372 (1968); *Chart v. Gutmann,* 44 Wis. 2d 421, 171 N.W.2d 331 (1969), *cert. denied* 397 U.S. 973, 90 S. Ct. 1089, 25 L. Ed. 2d 267 (1970); *Pa. Labor Rel. Bd. v. Uniontown H. Assn.,* 432 Pa. 146, 247 A.2d 621 (1968); *Magreta v. Ambassador Steel Co.,* 380 Mich. 513, 158 N.W.2d 473 (1968). See, also, *Lincoln Woman's Club v. City of Lincoln,* 178 Neb. 357, 133 N.W.2d 455 (1965); *State v. Standard Oil Co.,* 100 Neb. 826, 161 N.W. 537 (1917). If there is to be a change in the ex-

isting law it is not incumbent upon this court to make it. *Lincoln Woman's Club v. City of Lincoln, supra.*

The employer in this case was entitled to rely on the rule announced in *Borchman, supra.* Had the employer been operating under the rule announced today it might well not have caused the removal of its equipment from the employment site in, as it testified, anticipation of the customary refusal of the members of one union to cross the picket line of another union.

One of the values of legal precedent in a society governed by laws is that the certainty created allows a member of that society to accurately and safely anticipate the consequences of specific conduct. While we do not slavishly adhere unnecessarily to precedent for its own sake, the doctrine of stare decisis is based on public policy, is entitled to great weight, and should be adhered to unless reasons therefor do not exist, are clearly erroneous or mischievous, or unless more harm than good will result from doing so. *Lincoln Woman's Club v. City of Lincoln, supra; Nebraska Conf. Assn. Seventh Day Adventists v. County of Hall,* 166 Neb. 588, 90 N.W.2d 50 (1958). Indeed, that we are generally mindful of the disorder which follows sudden departure from clearly established precedent is illustrated by our recent refusal to apply retrospectively the modification of an evidentiary rule. *Langfeld v. Department of Roads, ante* p. 15, 328 N.W.2d 452 (1982).

There is nothing in this record to justify judicial disruption of what has been the settled policy and law of this state for two and one-half decades. By affirming the actions of the Department of Labor and the court below, the majority has permitted an arbitrary administrative usurpation of legislative power.

I would reverse the court below and dismiss the employee's claim.