(No. 27319.—

WALGREEN Co., Appellant, *vs.* FRANCIS B. MURPHY, Director of Labor, *et al.,* Appellees.

*Opinion filed January 18, 1944—Rehearing denied March 16, 1944.*

WOLFE, KEANE & GOMBERG, (OSCAR M. WOLFF, THOMAS E. KEANE, and JULIAN A. TISHLER, of counsel,) all of Chicago, for appellant.

Mr. JUSTICE WILSON delivered the opinion of the court:

A judgment of the circuit court of Cook county quashed a writ of *certiorari* sued out to review the decision of the Director of Labor of the State finding 320 warehouse employees of the plaintiff, Walgreen Co., who had participated in a strike from July 31 to August 19, 1941, were not ineligible for benefits under the Unemployment Compensation Act. Plaintiff prosecutes this appeal.

Walgreen Co. is an Illinois corporation engaged in the wholesale and retail sale of drugs and other merchandise commonly sold in retail drug stores. The corporation owns and operates approximately 240 retail stores. It also owns and operates a warehouse located at 4720 S. St. Louis avenue, Chicago, from which wholesale sales are made. July 2, 1940, the National Labor Relations Board found that the employees of the warehouse involved in this proceeding constituted a unit appropriate for the purposes of collective bargaining, and that the Chicago Drug Workers Association, Inc., was their exclusive bargaining representative. Subsequently, a written collective bargaining agreement was signed by the company and the association. On July 30, 1941, the association demanded a twenty per cent increase in wages for the employees represented by it. The demand was not granted, and on July 31, 1941, 280 employees of the warehouse stopped work and walked out of the warehouse. Other employees ceased work the same

day, and the next day, additional employees failed to report for work. Approximately 320 employees went out on strike and about thirty employees represented by the association remained at work. The striking employees did not return to work until August 19, 1941, following an agreement between the company and the collective bargaining agent representing them. The warehouse employees made application for benefits under the Unemployment Compensation Act for the period from July 31 to August 19, 1941. On September 9, a deputy designated by the Director of the Department of Labor made a determination, without notification to the company of a hearing, that the claimant employees were not ineligible for benefits under section 7(d) of the act. (Ill. Rev. Stat. 1943, chap. 48, par. 223.) The company appealed from this determination to the Director of the Department of Labor. The Director appointed a representative, a professor of economics, to hear the company's appeal. Considerable evidence was heard and, on April 27, 1942, the representative filed his report with the Director, who, on May 1, 1942, confirmed the report. The *certiorari* proceedings in the circuit court followed and resulted in a judgment confirming the decision of the Director of Labor.

The warehouse, located several miles from the principal office of the Walgreen company, consists of a two-story brick building, one block long and about three quarters of a block wide, containing approximately 300,000 square feet. Ray Phelps, general superintendent, supervises and manages the warehouse, devoting his entire time to warehouse operations. He performs no duties incident to the operation of the stores. The warehouse sells a general line of drugs and other articles now commonly found in drug stores. Specifically, it sells some 5000 different items to the company's retail drug stores, to sixty stores controlled by subsidiary companies, to 600 drug stores independent of the company and to 53 hospitals, country clubs

and industrial organizations. For the year ending September 30, 1941, net sales of the warehouse aggregated approximately $23,000,000. Of this total, about $13,000,000 represented sales to retail stores of the company and the greater part of the remainder to other retail customers. The warehouse employs an average of 350 employees. It maintains and keeps its own records. The warehouse employs its own watchmen, engineers and maintenance crew. Other drug warehouses in the metropolitan area commonly operate as separate businesses. Retail drug stores in the Chicago area generally operate without a warehouse. The company's retail stores could operate if the warehouse ceased doing business. Similarly, the warehouse could continue to operate if the company's stores ceased operations. The retail stores continued normal operations during the strike and, apparently, could have continued to do so indefinitely. The relationship between the warehouse and the retail stores is no closer functionally than exists between independent drug wholesalers and their retail customers.

The company contends that the declaration of public policy in section 1 of the Unemployment Compensation Act (Ill. Rev. Stat. 1943, chap. 48, par. 217,) reflects the legislative intent to exclude from benefits persons voluntarily out of employment on account of labor disputes. In particular, it challenges the eligibility of the employees involved to benefits on the ground, among others, that their unemployment was due to participation in a stoppage of work, namely, a strike, resultant from a labor dispute at the "establishment" or "other premises" where they were employed, within the contemplation of section 7(d) of the statute.

Recourse to extrinsic aids for construction in determining public policy becomes unnecessary where the statute, as here, specifically declares the public policy motivating the enactment of the ameliorative provisions of the Unemployment Compensation Law. "As a guide to the

interpretation and application of this Act," section 1 declares the public policy of the State: "Economic insecurity due to involuntary unemployment has become a serious menace to the health, safety, morals and welfare of the people of the State of Illinois. Involuntary unemployment is, therefore, a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family." This declaration of policy expresses the legislative intention that only those who are involuntarily unemployed shall receive unemployment compensation. (*Caterpillar Tractor Co.* v. *Durkin,* 380 Ill. 11.) One who strikes becomes voluntarily unemployed. (*Kemp* v. *Division No. 241,* 255 Ill. 213.) A strike in the labor sense is generally defined as a stoppage of work by common agreement of a body of workingmen for the purpose of obtaining or resisting a change in the conditions of employment. (15 C. J. S., Conspiracy, p. 1008, sec. 11.) The manifest legislative intent is that "stoppage of work" was deemed synonymous with "strike." A contrary construction would, in effect, attribute to the General Assembly an intent to finance strikes out of unemployment compensation funds. (*Bledsoe Coal Co.* v. *Review Board,* 46 N. E. (2d) (Ind.) 477; *Board of Review* v. *Mid-Continent Petroleum Corp.* 141 Pac. (2d) (Okla.) 69.) Had the legislature so intended, appropriate language would undoubtedly have been employed to accomplish its objective. We can not, under the guise of construction, impute such an intent to the General Assembly, particularly where, as here, the policy motivating the legislation is specifically declared to be the alleviation of economic insecurity incident to involuntary unemployment. Ill. Rev. Stat. 1943, chap. 48, par. 217.

To effectuate the declared policy of the General Assembly, section 7 of the Unemployment Compensation Act

ordains: "An individual shall be ineligible for benefits * * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided, that this subsection shall not apply if it is shown that (1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (2) He does not belong to a grade or class of workers of which immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment, or other premises."

Admittedly, a labor dispute existed between the company and the warehouse employees. No attempt was made to show that any claimant was not participating in, financing or directly interested in the labor dispute and did not belong to a grade or class of labor, some member of which was participating in, financing or directly interested in the dispute. There was, without question, a stoppage of work at the warehouse resulting from a labor dispute between the employer and the claimant employees, the shutdown substantially interfering with warehouse operations, curtailing them to approximately twenty per cent of normal production. For all practical purposes, there was a cessation of the operation of the establishment and a cessation of work. In short, there was both a stoppage of work and a labor dispute at the warehouse. Since the Walgreen company admits that its warehouse is not a factory, the precise

issue presented for decision is whether the warehouse is an "establishment" or "other premises," within the contemplation of section 7(d). The Director's representative stated the question in the alternative, adding, "or is it to be classified as one segment or subdivision of a carefully organized and elaborately integrated larger whole, namely, the chain store business of the Walgreen Company." From this statement of the question presented, he proceeded to propound a theory that "geographic isolation is less important than functional integration in arriving at a definition of a separate factory or establishment; and in a chain store system the warehousing function is unusually significant, for the basic concept of the whole system lies in the method of making available to small retail stores the low unit costs attainable through large-scale buying standardized products, centralised planning and direction, and a quick and efficient scheme of distribution." He concluded: "In summary, it seems apparent that the warehouse has only the semblance or the shell, rather than the substance and reality, of a separate business. It must be concluded, therefore, since the warehouse is only one integrated unit of the chain store system of the Walgreen Company, and since there is no evidence to indicate that the total business of the Company was appreciably affected by the labor dispute at the warehouse, that there was no stoppage of work, and that consequently the claimants in this case who were warehouse employees are eligible for benefits." The vice of the statement of the issue by the representative and his conclusion,—if we understand it—is that economic theories not expressed in the statute have been injected into the proceeding in order to arrive at a conclusion unwarranted by the plain and unambiguous language of section 7 (d). Vagaries of professorial theorists cannot be permitted to add a test of functional integration, a test not prescribed by the statute, as an element determinative of whether claimants are entitled to unemployment compensation benefits.

The words "establishment" and "premises," employed in section 7(d), are so commonly understood as units of place that further definition is superfluous. The words of a statute are to be taken in their ordinary meaning in general and popular use, unless a different meaning was intended, and such meaning must be accepted unless clearly wrong. (*Potson* v. *City of Chicago*, 304 Ill. 222.) To avoid the plain meaning of these familiar terms, the Director of Labor maintains that the warehouse is not an establishment because it performs functions incident to the company's entire system of transacting business and for the further reason that the retail stores did not cease operations while the strike was in progress. The words "establishment, or other premises" are employed in the statute without qualification. In particular, the legislature did not prescribe that an establishment must be essentially different from any other unit of the employer's business. Indeed, the words "factory, establishment, or other premises" are not modified by the word "separate." Nor does section 7(d) declare that there is no work stoppage at any particular "establishment, or other premises" unless the employer's operations in all their ramifications are completely, if not disastrously, affected. Complete geographic isolation, contrary to the determination of the representative of the Director of Labor, is sufficient to justify classification of the warehouse as an establishment. Section 7(d) makes every "factory, establishment, or other premises" a unit for the purpose of ascertaining whether a stoppage of work due to a labor dispute exists. Here, the warehouse was an "establishment" or "other premises" by the mere fact of its location, or "geographical isolation," apart from all other establishments and enterprises of the Walgreen company. Our conclusion is fortified by the last proviso of section 7(d) which broadens the grounds of ineligibility to benefits by declaring that if separate branches of work commonly conducted as separate businesses in separate prem-

ises are conducted in separate departments of the same premises, each department shall be deemed to be a "separate factory, establishment, or other premises." This proviso conclusively demonstrates that the legislature intended each place of business to be a unit for the determination of whether there is a stoppage of work. Furthermore, the proviso tends to indicate that there is no question of a separate business involved in the present case. The warehouse was a separate unit in itself, housed in an establishment or premises far distant from the main offices of the company, all the employee claimants worked in this unit of business and all participated in a stoppage of work. As the direct result, there was a stoppage of production at the warehouse, a distinct unit of the employer. Whether the warehouse is a separate business is beside the point. The question of separate branches of work commonly conducted as separate businesses becomes material only where conducted in the same premises, as in *Caterpillar Tractor Co.* v. *Durkin,* 380 Ill. 11. Application of the tests prescribed by section 7(d) for deciding ineligibility to benefits precludes the claimant employees of the warehouse, an "establishment," from benefits while they were absent from work on a strike. The decision of the Director of Labor confirming his representative and, in turn, a deputy, upon the theory that there was no stoppage of work because the warehouse was not a "separate establishment" is without a statutory basis.

For the reason that the claimant employees were participants in a labor dispute which caused a stoppage of work at an establishment where they were employed, they disqualified themselves from eligibility to benefits under the act. The judgment of the circuit court must, therefore, be reversed and the cause remanded, with directions to quash the record of the Director of the Department of Labor. *Reversed and remanded, with directions.*