Tennessee Coal, Iron Railroad Company (employer) appealed to the Circuit Court of Jefferson County from decisions of the Board of Appeals of the Department of Industrial Relations awarding Burney Martin and others (employee-claimants) unemployment compensation under Code 1940, Tit. 26, § 180 et seq. From judgments of the Circuit Court in favor of the employee-claimants, the employer appealed to the Court of Appeals, and said judgments being affirmed by the Court of Appeals, the Tennessee Coal, Iron Railroad Company now applies to the Supreme Court for certiorari to review and revise the judgment and decision of the Court of Appeals in the case of Tennessee Coal, Iron R. Co. v. Martin et al.,33 Ala. App. 502, 36 So.2d 535.
Affirmed.
The majority opinion of the Court of Appeals, brought under review, is as follows:
Harwood, Judge. This case was originally assigned to Presiding Judge Bricken. In the opinion prepared by Judge Bricken the facts have already been sufficiently set forth obviating the necessity of further recital thereof in this opinion.
The majority of the court being unable to concur in certain conclusions reached by Judge Bricken therefore express their conclusions below.
In the opinion on the rehearing in the Drummond case (Department of Industrial Relations v. Drummond), 30 Ala. App. 78, 1 So.2d 395, 401, this court stated that the essential purpose of the Alabama Unemployment Compensation Act, Code 1940, Tit. 26, § 180 et seq., was "to minimize the harmful effect on society of unemployment; that it is, in character, a form of insurance for the unemployed worker, is *Page 154 
remedial in nature, and should be liberally construed in his favor."
This indisputable premise, in our opinion, furnishes the clearest marker for our guidance on the tangled trail of judicial decisions and opaque statutory declarations in this developing field of jurisprudence.
In his opinion Judge Bricken states that "The parties also seem to be in accord that the strike above referred to was a labor dispute within the meaning of such section." We are unable to accord to the contentions of appellees' counsel, urged in oral argument and in briefs filed, the conclusion reached by Judge Bricken as to such accord. As we interpreted the argument and briefs of counsel representing the appellees they strenuously contend that there is no labor dispute within the meaning of our statute and judicial interpretations thereof.
However, since the 1939 Amendment to Section 214, subd. A, Title 26, Code of Alabama 1940, defining a "labor dispute" as the term is defined in National Labor Relations Act,29 U.S.C.A. § 151 et seq., and the Norris-La Guardia Act,29 U.S.C.A. § 101 et seq., it is our opinion that appellees' unemployment was directly due to a labor dispute. Section 214, subd. A, supra. Badgett v. Department of Industrial Relations,30 Ala. App. 457, 10 So.2d 872; Id., 243 Ala. 538, 10 So.2d 880; New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552,304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012; Lauf v. E. G. Shinner 
Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872.
It is our opinion therefore that the lower court erred in its reasoning that appellee's unemployment did not result directly from a labor dispute.
Conditions in addition to the worker's involuntary unemployment directly due to a labor dispute must be concurrently present under our law to bring about his disqualification to receive unemployment benefits. The labor dispute must be in active progress, and "in theestablishment in which he is or was last employed." (Italics ours.)
There are no cases from either our Supreme Court, or this court, construing the meaning of the word "establishment," nor does the Act contain any definition.
The conditions disqualifying a worker from the benefits of our Act constitute exceptions thereto. Exceptions from legislation humanitarian and remedial in nature must be narrowly construed, giving due regard to the plain meaning of statutory language and legislative intent, Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095, 157 A.L.R. 876, and in Canadian Pacific R. Co. v. United States, 9 Cir.,73 F.2d 831, 834, the Circuit Court of Appeals for the Ninth Circuit declared:
"A proviso or exception which restricts the general scope of the act must be strictly construed, and will not be permitted to take any case out of the enacting clause which does not clearly fall within its terms, and the burden of proof is on one claiming the benefit of the proviso."
Our Unemployment Compensation Act was originally passed in 1935. It operated in a virgin field. England had originally and experimentally passed a similar system of law in 1911, which was revised as trial exposed weaknesses. Wisconsin passed such legislation in 1932. St. 1945, § 108.01 et seq. The passage of the Social Security Act by Congress in August 1935,42 U.S.C.A. § 301 et seq., induced other states to enact such laws. Ours was perhaps the second state act in this country. All states now have similar acts including the basic requirements laid down by the Act of Congress, but differing widely in details which Congress left open to State legislation. While there is an immense body of decisional law in this field enunciated by the agencies to which its administration has been committed, there are comparatively few judicial interpretations.
The relative recency of the law and the paucity of judicial decisions thereon create historical nuances rather than historical facts, which are of only small import in a historical interpretation of the true purpose of the Act. As stated by the Superior Court of Pennsylvania in Bliley Electric Co. v. Unemployment Compensation Board of Review, 158 Pa. Super. 548, 45 A.2d 898, 902:
"Until more cases involving a wide variety of factual situations have been *Page 155 
brought to the courts, judicial answers will necessarily lack the usual rigor of legal formulas, and tend to be tentative and groping in their nature. Concrete cases will develop general principles, and precise definition will issue from the wisdom acquired by greater experience."
The Tennessee Coal, Iron and Railroad Company has set up separate divisions for its operations:
1. The Manufacturing Division consists of all the coke ovens, blast furnaces, and finishing plants.
2. The ore mines and quarries divisions.
3. The Coal Mines Division.
4. The Rail Transportations Department.
There is also a health department, operating a large hospital, and an industrial relations department.
By a "chain of command" the management of all of the departments is directed into the office of the President who has general supervision and direction over all the business and operations of the company.
Evidence introduced by the appellants in the proceedings below tends to show that the operations of the company are planned on a yearly basis; that the functions of each department or division, particularly those concerned with production, are integrated and coordinated each with the other in a general schedule. For this reason the appellant contends that the coal mines are so functionally integrated and coordinated with the other departments and divisions that all must be considered as an integral of one operating unit or establishment.
On the other hand the appellees contend that in the above mentioned departments and divisions the respective employees are engaged in different occupations, and consequently belong to different unions, wholly separate and independent one of the other; that the Coal Mines Division is under the general superintendence of one man, whose authority does not extend to any other department; that this division promulgates its own safety rules and regulations; that each coal mine has its own superintendent whose authority extends to no other mine; that coal miners desiring employment with the Company apply to the Coal Mines Division; and that the mines are geographically separated from the other operating plants and mills of the Company. In short the appellees contend that there is such a degree of isolation in management and space that a concept of functional integrality cannot with propriety be applied so as to conclude that the coal mines were not a separate establishment in themselves.
The appellant earnestly asserts that the Wisconsin case of Spielmann v. Industrial Commission, 236 Wis. 240, 295 N.W. 1,3, necessitates a conclusion that the word "establishment" as used in our act includes all functionally integrated components of a single manufacturing unit, particularly in light of the fact that the Alabama Act, like the Wisconsin Act, St. 1939, § 108.04, omits the words "factory, or other premises" found in many other state acts in addition to the word "establishment", and uses only the word "establishment." In this connection it should be noted that at least one court has taken the view that the words "factory", "establishment," or "other premises" as used in its Unemployment Compensation Act, Laws Alaska 1937, Ex.Sess., c. 4, as amended, were ejusdem generis, and that the principle of noscitur a sociis applies. See Aragon case, 9 Cir., 149 F.2d 447.
The facts upon which the Wisconsin Court [236 Wis. 240,295 N.W. 3], found the two plants to be a single "establishment" are as follows:
"The employer is a Maryland corporation and is engaged in, among other things, the manufacture of automobiles. It has a body plant in Milwaukee and an assembly plant at Kenosha. The employe worked at the Milwaukee plant.
"The Milwaukee plant is devoted exclusively to the manufacture of bodies for the several models of the employer's cars. The Kenosha plant is devoted exclusively to the manufacture of parts other than bodies, and to the assembly of the completed cars. There are no other plants of the employer engaged in automobile manufacture. *Page 156 
"Ninety-eight per cent of the cars are built against specific orders. Because of the numerous possible combinations in model, color, trim, accessories, etc., it is necessary that production schedules be carefully planned in advance. Accordingly the work of both plants is projected on a monthly, weekly and daily base by a central planning department located at the Kenosha plant. The production in each plant is highly synchronized and the work of the two plants is so co-ordinated that a body built in the Milwaukee plant against a given car order will meet the chassis built in the Kenosha plant against the same order, pursuant to a prearranged schedule. It is endeavored to keepthe hourly rate of production of the two plants the same.
"The two plants are approximately forty miles apart. The bodies are transferred from the Milwaukee plant to the Kenosha plant by trucks owned by the employer and driven by its employees. The employer has a General Works Manager in charge of the operation of the two plants." (Italics ours.)
The court found that because of the functional integrality, general unity, and physical proximity of the two plants they constituted one establishment.
In the course of its opinion the Wisconsin Court sets forth the following:
"The appellant urges eight facts that he claims show that the two plants do not constitute a single establishment: (1) 'The two are forty miles apart.' This is covered above. (2) 'Each has its separate wage and labor contract.' But each craft in a single plant may also have these. (3) 'Each has its own seniority and service records.' So has each craft in a single plant. Seniority rights in one craft give an employee no rights in any other craft. (4) 'Each has its own labor union to represent it.' So may each craft in a single plant. (5) 'Negotiations for working conditions in one are carried on without contact with the other.' So it may be as to each craft, or a separate department in a single plant. (6) 'An employee in one plant has no standing in the other.' Also an employee in one craft in a single plant has no standing in any other craft. (7) 'Each has its own hiring and firing department.' So may each department in a single plant. (8) 'In each the individual employee, his work, tools, hiring and discharge, immediate relationship with his employer is separate and distinct.' So they may be as to different crafts or departments in a single plant. As the same situations may exist as to different crafts or departments in a single plant, none of the things stated, and all of them together seem to us not to control the matter."
Upon a statute being adopted from another state it will be presumed to have been adopted with the settled construction placed on it by the courts of that state. (Italics ours.) Galloway Coal Co. v. Stanford, 215 Ala. 79, 109 So. 377. In Fuller v. Lanett Bleaching Co., 186 Ala. 117, 65 So. 61, Chief Justice Anderson wrote concerning the statute then under consideration:
"This is a literal reproduction of a Georgia statute which, at the time of adoption in this state, had been often construed
by the Supreme Court of Georgia, and which said construction is at least persuasive that our Legislature intended to adopt it as construed in the jurisdiction from which it was borrowed." (Italics ours.)
The word "establishment" was in our Act when the same was adopted in 1935. The Spielmann case, supra, was not decided by the Wisconsin Court until 1940. A single case does not constitute a settled construction. These considerations considerably weaken the persuasiveness of the Spielmann case.
We note that the Wisconsin Court in the Spielmann case, supra, listed some eight factors on which the appellant in that case relied to show that the two plants did not constitute a single "establishment." Many of these factors are also present in the instant case. The Wisconsin Court attached little significance to these factors because they might also be present in each craft in a single plant, or in different departments in a single plant. This of course is true. Even so, it is our view that such possibility as mentioned by the Wisconsin Court does not destroy the value of the mentioned factors as indicating the true nature of the operational set up of a manufacturing business. *Page 157 
If these factors are not of importance, then just what elements would furnish light as to the true situation?
The Supreme Court of Michigan in Chrysler Corporation v. Smith, 297 Mich. 438, 298 N.W. 87, 135 A.L.R. 900, considered the meaning of the word "establishment" as it appears in the Michigan Act, Pub.Acts 1936, Ex.Sess. No. 1, § 29(d), as amended, by Pub.Acts 1939, No. 324, which is highly similar to our Act. In that case a labor dispute actively in progress in the main plant stopped work in the eight other essential, coordinated plants of the Chrysler Corporation, all located in the Detroit area. The majority of the Michigan Court in its determination of the meaning of the word "establishment", as it appears in the Michigan Act, seems to have been persuaded by and to have adopted the conclusions of the Wisconsin Court in the Spielmann case, supra, that functional integrality and coordination is the primary test in interpreting the meaning to be attached to the word "establishment."
The degree of coordination, or integrations, certainly in the Spielmann case, supra, and inferentially in the Chrysler case, supra, is vastly different from the integration and coordination present in the instant case. In the Spielmann case the two plants were integrated on an hourly basis, ninety-eight per cent of the cars being built against specific orders for cars of certain models, trims, color, etc.
In the present case the integration was between entirely different kinds of manufacturing enterprises.
To our mind there is a significant difference of degree between an assembly line integration of finished products, such as was present in the Spielmann case, supra, and an integration of entirely different types of raw material production and processing plants as exist in this case.
Integration is often present where plants are operated by entirely different owners. Certainly under these conditions the test of functional integrality could not be said to cause such separately owned plants to constitute a single establishment.
Nor do we consider the fact that the ultimate management of the various enterprises of the Tennessee Coal, Iron and Railroad were pyramided into the office of the President determinative or of particular value in disclosing whether the coal mines operated by the company were a separate establishment. The record discloses that the Tennessee Coal, Iron and Railroad Company is wholly owned by and a subsidiary of the United States Steel Company. The United States Steel Company exercises control over the Tennessee Company only to the extent of promulgating general policies for the guidance of the self contained entities of the Steel Company. There is however an intimate contact between the Steel Company and the Tennessee Company through consultation and conferences between the officials of the two companies. Since it owns its subsidiaries there is no reason why the Steel Company could not pyramid the ultimate management of all its subsidiaries into one central head. Under this situation it could be reasonably argued, if the test of ultimate management be adopted, that all of these enterprises, different in kind and separated by vast distances constituted but a single "establishment."
It is therefore clear to us that the tests of unity of management and integrality of function, while furnishing aid in determining the true meaning of the word "establishment" as it appears in our Act, are essentially only rule of thumb tests.
On the other hand, the Illinois Supreme Court in Walgreen Co. v. Murphy, 386 Ill. 32, 53 N.E.2d 390, 394, had before it the question of whether a warehouse, a component part of a chain or retail drug stores, was an "establishment" under the Illinois Unemployment Compensation Act. Smith-Hurd Stats. c. 48, § 223(d). The warehouse was located several miles from the main office of the drug company. The warehouse was under a general superintendent who devoted his entire time to the management of the warehouse and exercised no authority incident to the operation of the retail drug stores. The Illinois Court concluded that the warehouse was a separate establishment in itself. In the course of its opinion the court wrote:
"The words 'establishment' and 'premises,' employed in section 7(d), are so commonly *Page 158 
understood as units of place that further definition is superfluous. The words of a statute are to be taken in their ordinary meaning in general and popular use, unless a different meaning was intended, and such meaning must be accepted unless clearly wrong."
The court concludes that the complete geographical isolation of the warehouse was sufficient to justify its classification as a warehouse.
In Phillips Inc. v. Walling, supra the Supreme Court of the United States considered the meaning of the words "retail establishment", as it appears in Section 13(a) (2) of the Fair Labor Standards Act, 29 U.S.C.A. § 213(a) (2), exempting from the operation of the Act employees "engaged in any retail * * * establishment."
The petitioner corporation in this case operated a chain of 49 retail grocery stores, and quite apart from these retail stores it maintained a separate warehouse and office building. Merchandise was supplied each store on requisitions prepared by the individual store managers, subject to revision by one of the superintendents in the central office, being thus clearly functionally integrated with the retail outlets.
In holding the warehouse not to be a retail establishment the court said [324 U.S. 490, 65 S.Ct. 809]:
"Petitioner claims that its retail stores, warehouse and central office together constitute a 'retail establishment' within the meaning of this exemption. * * * But if, as we believe, Congress used the word 'establishment' as it is normally used in business and in government — as meaning a distinct physical place of business — petitioner's enterprise is composed of 49 retail establishments and a single wholesale establishment."
When the above case was before Circuit Court of Appeals for the First Circuit, that court, in commenting on a legislative change in the phraseology of the Fair Labor Standards Act during its passage, wherein the word "establishment" was substituted for "industry" stated:
"Obviously, the word 'establishment' was never meant to mean an entire organization." Phillips v. Walling, 1 Cir.,144 F.2d 102, 105.
Section 183 of our Unemployment Compensation Act contains language clearly indicating a legislative concept of separate establishments within one employing unit, for that section concludes as follows:
"All individuals performing services within this state for any employing unit which maintains two or more separateestablishments within this state shall be deemed to be employed by a single employing unit for all the purposes of this chapter." (Italics ours).
It is also clear that under the statutes licensing and taxing chain stores in this state the term "establishment" as employed by the legislature in these statutes meant each geographically separated store, regardless of unity of management or ownership of the several stores comprising the chain. See Sections 620 through 627, Title 51, Code of Alabama 1940.
Had the various Unemployment Acts of the different states been in existence for a longer period of time so that they had progressed beyond the trial and error stage, then in our opinion the legislative histories of such acts, and the judicial interpretations of other jurisdictions would be of stronger significance. Our opinion is that the present stage necessarily invites that we interpret and give meaning to words in our Unemployment Compensation Act as they are commonly used and understood. Each case must be particularized on its own facts. This being so it is our further opinion that the coal mines in which the appellees were employed must, under the facts of this case, be considered as an establishment separate from the establishment or establishments in which a labor dispute was in progress.
While we disagree with the reasoning of the court below, and the basis of its conclusion, we think its conclusion is correct. The judgment should therefore be affirmed.
Affirmed.
The dissenting opinion is in part as follows:
Bricken, Presiding Judge (dissenting). The appellant, Tennessee Coal, Iron *Page 159 
Railroad Company, is engaged in the production of steel in Jefferson County, Alabama, where it operates a large steel industry.
The production of steel requires that raw materials, limestone, ore and coal be assembled and processed. The ore furnishes the iron content. Coal is one of fuel for heating in the reduction and limestone is a flux.
The ore, and the coal after conversion into coke and the flux is processed through a blast furnace producing pig iron which is in turn processed in the open hearth furnace into steel ingots, which is later processed through various mills and converted into steel products.
The company sells no ore, coal, coke or limestone or pig iron as such. The mining and transportation of the ore, coal and limestone, and their conversion into pig iron are all a part of one operation designed to accomplish but one thing, namely, the production of steel ingots. Each operation is necessary and essential to the production of steel ingots, and if any operation is interrupted, all related operations are vitally affected.
The various units of the industry are located at different places. The ore mines are in one place. The coal mines in another. Limestone is quarried in still another locality. The furnaces are located roughly near the center of territory from whence the raw materials are obtained. These units are connected by a standard gauged railroad operated by the company and the result of their collective functioning is the production of steel ingots.
Employees engaged in mining coal are affiliated with the United Mine Workers of America (A.F. of L.), the certified bargaining agent for the coal miners. Employees engaged in mining ore belong to the International Union of Mine, Mill and Smelter Workers (C.I.O.) Employees working in the furnaces and mills are members of the United Steel Workers of America (C.I.O.). Employees who operate the railroad are members of different railroad unions. The labor organizations are separate and distinct organizations and act independently in representing their members. For instance the United Mine Workers negotiate a contract relating to wages, hours and working conditions of coal miners. The ore miners have a contract relating to workmen mining ore, and the Steel Workers negotiate a contract for the steel workers.
From January 21st to February 18, 1946, the Steel Workers and the ore miners were on a strike. The Coal Miners did not participate in the strike, nor were they responsible in any degree for the strike that directly and effectively prevented the operation of the coal mines and other units of the industry.
Burney Martin and the other appellees, coal miners, were idle during the period mentioned due directly to said strike. They filed claims for unemployment compensation under Title 26 of the Code of Alabama of 1940. Their claims were denied by the Director of Industrial Relations, who was overruled by a majority of the Board of Appeals, which was in turn sustained by the trial court on a trial de novo, where the claims were allowed. That ruling is now here for review.
In view of the difference of opinion existing in the Court of Appeals, and the troublesome nature of the question arising in this cause, we issued the writ of certiorari in order that it may be set down for oral argument and extensive briefs. Exhaustive research by industrious counsel, as well as oral argument, for the respective parties has presented every phase of the questions here involved. Indeed, counsel for both appellant and appellee have gone into the record for facts which do not appear in the opinion of the Court of Appeals. But we consider that a matter of no material importance, as the facts so appearing sufficiently present the questions here for review.
As, upon due consideration, we have concluded that the majority opinion of the Court of Appeals, prepared by Judge Harwood, correctly decides the case, we feel that more elaborate discussion is here unnecessary and would in fact serve no useful purpose. Reduced to a simple analysis, that opinion merely holds that the coal mines in which there was no labor dispute was an "establishment" within the meaning of our Unemployment Compensation statute. Title 26, Sec. 214, Code 1940.
Counsel for appellant very forcefully argued the historical background of legislation of this character, both by the British Parliment and by several states of this Union. To this argument we have given most careful study. Counsel also lay stress upon the difference in our own Act and that of some other states, notably, as we recall, Wisconsin and Michigan, in which the legislative enactment contains a preamble concerning the policy of the state in passing the law. But when the constitutionality of the 1935 Unemployment Compensation Act was tested in Beeland Wholesale Co. v. Kaufman, 234 Ala. 249,174 So. 516, 522, the act was upheld upon the theory of the exercise by the state of its police power. We therein stated the evident purpose of the Act to the effect that it was part of a nationwide program to prevent wide spread unemployment for an appreciable period, and that it was co-ordinated with similar acts in other states. We therein observed: "Extensive unemployment depreciates consumer purchasing power, and tends to demoralize a large class of citizens, and to stimulate crime, disorder, and social degradation. That is the rationale of the program, as we understand it. * * * Economic welfare on a large scale extending to every form of business and affecting every person in a state is within its police power to protect as well as their purely physical and moral condition. * * * But such conditions do, as everybody knows, affect the physical and moral welfare of the people. Starvation or the tendency to it, due to economic depression, is as alarming and dangerous to the state and its people as that condition due to flood, drouth, or earthquake."
There are other expressions of similar import, all of which lead to the result that in the passage of this statute the state was within the exercise of its police power. We merely make mention of these observations, reiterated in Department of Industrial Relations v. Drummond, 30 Ala. App. 78, 1 So.2d 395, here reviewed in Department of Industrial Relations v. Drummond, 241 Ala. 142, 1 So.2d 402, as *Page 162 
indicating the failure of the Legislature in the passage of the Act to have a similar preamble to that of other states is a matter of no material consequence.
The majority opinion of the Court of Appeals directs attention to the well known principle that humanitarian statutes of this character are to be liberally construed, and that the disqualification of a worker from the benefits thereof constitutes an exception which should be narrowly construed. It is the duty of the courts in construing the statute to carry out the legislative intent and rules of construction are merely aids to this end. But these rules of construction are here important to be considered for they in fact form the basis of the ruling in this case. Certainly, as recognized in the majority opinion, due regard must be given to the plain meaning of the language of the statute. True, there are many definitions in the dictionary given to the word "establishment." But we think the definition as found in Webster's New International Unabridged Dictionary, Second Edition, as a place of business, is perhaps the one most commonly used and understood, and applicable to the language of our statute. In Phillips, Inc. v. Walling, 324 U.S. 490,65 S.Ct. 807, 89 L.Ed. 1095, 157 A.L.R. 876, the court, construing the word "establishment" in an Act of Congress held that it was used in the Act as "normally used in business and in government — as meaning a distinct physical place of business." Clearly enough under the liberal interpretation of this statute, and the strict construction rule applicable to the matter of disqualification, the courts would not be justified in construing this word as meaning functional integrality and general unity of the business of a large corporation as the Tennessee Coal, Iron Railroad Company with its many and varying units of industry. From the facts as found by the Court of Appeals, it is clear enough that the coal mine was the physical place of business of this claimant, and that being the normal and usual meaning and application of the word "establishment," we are persuaded that the Court of Appeals was correct in giving that interpretation, as found in the majority opinion. The Illinois court in Walgreen Co. v. Murphy, Director, etc., 386 Ill. 32, 53 N.E.2d 390, expressly determined the meaning of the word "establishment" with the observation that words of a statute are to be taken in their ordinary meaning in general and popular use unless a different meaning was intended, and such meaning must be accepted unless clearly wrong. Though differing in some respects from our own statute, the case of Wicklund v. Commissioner of Unemployment Compensation and Placement, 18 Wn.2d 206, 138 P.2d 876, 148 A.L.R. 1298, from the Supreme Court of Washington, in continuing the statute of that state, sustains a like view.
The cases most nearly in point upon which appellant relies, the Spielmann case from the Wisconsin court and the Chrysler case from the Michigan court, we have examined with particular care. We rest content with the observation of the Court of Appeals from these two authorities, but with the further observation, however, that no stress appears to have been made by the courts in those cases upon the matter of liberal construction of the statute and strict construction of the disqualification provision. It is only fair to state that the dissenting opinion of Justice McAllister, concurred in by Justice Bushnell, in the Chrysler case does lay emphasis upon this fundamental rule of construction, observing that to bring the claimant within the influence of the exceptions, it is necessary to strain at the meaning of the language of the statute and to read into the act exceptions with regard to "integrated industry," which are not mentioned anywhere in the legislation. We have likewise considered other authorities noted by appellant, among them Tucker v. American Smelting 
Refining Co., Md., 55 A.2d 692; Carnegie-Illinois Steel Corp. v. The Review Board, Ind. App., 72 N.E.2d 662; Johnson v. Pratt, 200 S.C. 315, 20 S.E.2d 865; General Motors Corp. v. Mulquin, 134 Conn. 118, 55 A.2d 732, as well as rulings of some administrative boards. In large part these several rulings take their lead from the Spielmann and Chrysler cases, which we consider have been sufficiently dealt with by the Court of Appeals, to which discussion we need add no further additional *Page 163 
comment. While much more could well be written upon this question, we think what has been said suffices for all purposes, and we forego further discussion.
We are of the opinion, therefore, that the judgment of the Court of Appeals should be here affirmed.
In view of the further holding of the Court of Appeals, however, that this complainant's unemployment was directly due to a labor dispute, it becomes necessary for us to observe that in view of our affirmance of the judgment of the Court of Appeals upon the ground above noted, and upon which that court based its ruling, a discussion and consideration of this question becomes unnecessary and is therefore left to one side.
Upon the part of the appellee the insistence is that the Drummond case is decisive in their favor and upon that theory the three judge trial court rested its decision. While on the other hand appellant insists that the Drummond case was to be differentiated though it contains dictum supportive of the trial court. Upon this question there may here be a difference of view. Whatever might be said, however, upon that question would itself be dictum, and as a general rule the courts very properly decline to enter into discussions which are not decisive of the case. We merely make these observations to the end that we may not be bound by the holding of the Court of Appeals upon this particular question. It is left here undetermined.
Let the judgment stand affirmed.
Affirmed.
All the Justices concur.