(No. 31050.— ▇▇▇▇▇▇)

W. E. BARRETT *et al.*, Appellees, *vs.* WASSON COAL COMPANY *et al.*—(ROBERT L. GORDON, Director of Labor, Appellant.)

*Opinion filed September 22, 1949.*

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, JAMES C. MURRAY, RAYMOND S. SARNOW, and A. ZOLA GROVES, all of Chicago, of counsel,)

for Frank Annunzio, successor to Robert L. Gordon, as Director of Labor, appellant.

C. C. DREMAN, of Belleville, and RUMSEY & DENNIS, of Harrisburg, for appellees.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

The Illinois Director of Labor appeals from an order of the circuit court of Saline County which allowed unemployment compensation to W. E. Barrett and other mine employees, the appellees. An appeal to this court is authorized by section 14 of the Illinois Unemployment Compensation Act. Ill. Rev. Stat. 1947, chap. 48, par. 230.

The mine did not operate between April 2 and June 24, 1946. Claims for unemployment compensation benefits for that period were filed by the individual employees. A deputy of the Division of Placement and Unemployment Compensation of the State of Illinois, upon investigation of the claims, determined that none of the claimants were ineligible for employment benefits under the provisions of section 7(d) of the Illinois Unemployment Compensation Act, (Ill. Rev. Stat. 1947, chap. 48, par. 223,) and that cessation of production operations at the Wasson Coal Company mine was not due to a labor dispute. The company appealed to the Director of Labor whose representative recommended that the claimants be held ineligible for benefits under the act as their unemployment was due to a stoppage of work existing because of a labor dispute at the establishment by which they were last employed, and the Director confirmed and adopted this report as a part of his decision.

Pursuant to statutory authority, the case was then taken into the circuit court where, on August 28, 1948, the decision of the Director of Labor was reversed, appellees were held to be not ineligible for benefits and the cause was

remanded to the Director of Labor with directions to allow the benefits from April 2, 1946, to June 24, 1946. This appeal seeks to reverse the circuit court's decision.

The parties were operating under a master contract entered into between the Coal Producers Association of Illinois (of which Wasson Coal Company was a member,) for the employer, and the Progressive Mine Workers of America, District No. 1, for the employees. The wages and working conditions of the company's production and maintenance workers were governed by a collective-bargaining agreement arranged by and between district No. 1 of the union and the Coal Producers Association running from April 1, 1945, to March 31, 1947. Individual operators who were not members of the association operated under a separate or independent contract with the miners which bound the parties to the terms of the master contract. The master contract contained these provisions:

Section 42(b): "Should a significant change occur in government wage policy during the term of this agreement either party may give a ten-day notice in writing of a desire for a negotiating conference, and the other party agrees to attend such conference."

Section 42(c): "During the term of this agreement should any competitive field make a contract governing wages or working conditions more favorable to either miners or operators signatory hereto, then this agreement shall be modified so that both sides may receive all the benefits of such favorable agreement, subject, however, to approval by the proper governmental agencies."

The mine operated normally up to and including March 30, 1946. It did not operate the following day, March 31, which was Sunday, nor the next day April 1, which was a miner's holiday, nor did it resume operations until June 24, 1946.

Pursuant to said section 42(b), on March 29, 1946, it was agreed between the association and the union that a significant change had occurred in the governmental wage policy, and the agreement was modified for the month of

April to the extent that any increases in the basic hours and tonnage rates of pay and any other conditions jointly agreed to should be applied to the 1945-1947 contract, subject to approval of the proper governmental agencies. On the same day Wasson Coal Company withdrew from the association without assigning any reason for its action. The mine president testified that he considered the original agreement binding and that he was willing to continue operations under it as there were orders for coal and that the company desired to continue operations. He said the company refused to sign the supplemental agreement because he did not understand its terms and desired to rely upon the original contract.

Appellees have a different version of the company's position regarding work stoppage. Ernest Johnson was the district board member of the Progressive Mine Workers, Saline County being within his jurisdiction and under his authority. On March 30, 1946, he and other union officials conferred with L. A. Wasson, president and general manager of the company, who then stated that at the present time the company proceeds were too uncertain, that he was not making any money and was not going to go along with it any more. With reference to continuing to operate the mine after that date, he said: "I can't operate until the government lets me know for sure what I am going to get for the coal." During the period in question and for some time prior thereto the selling price of coal was fixed or regulated by a governmental agency (OPA).

The company having withdrawn from the association Johnson told the company president that the proper procedure, if he was going to operate independently, would be to sign an independent agreement, and showed him such agreement which had been prepared. The president then said: "At the present time the coal proceeds are too uncertain. I am not making any money the way it is, and I am not going to go along with it any more." Further, at

the same time he stated that his company had never missed a pay roll, but, by continuing operating and not knowing what he would get out of the process of the coal, he might not be able to operate.

The witness Johnson, sometimes referred to as "Pinch," testified that on May 15, 1946, he talked with Johnny Evans, the mine superintendent, and mentioned the fact that other mines were working and that he would like to see Wasson start, whereupon Evans replied: "Pinch, Wasson is not going to start until he finds out for sure what he is going to get for his coal." On April 22, 1946, the company sealed the mine temporarily because the supply of coal needed to keep it in condition was exhausted. The miners were not permitted to dig coal for the sole purpose of keeping the mine in condition.

May 22, 1946, the mines were taken over by the government. On May 27, 1946, after having received a telegram from the Deputy Coal Mines Administrator, Johnson again talked with the mine president about the mine operating and was told by him: "I am going to start this mine and I am going to send the government the bill and check for every ton of coal that is sold, and they are going to come down here and pay the damn pay roll. I am just going to start the mines for them." The mine president took the position that the operation of the mine was then a matter between the government and the miners. No one contends there was a labor dispute between those parties.

The above-quoted statements attributed to the mine president are not denied by him. He did say, however, according to the abstract, when testifying in chief: "I told them I couldn't sign something if I didn't know what I was signing. No, I didn't say we couldn't operate the mine. They said we couldn't operate unless we signed that retroactive agreement. I told them I'd have to know several things; what my obligation was going to be under that contract; that we had always met our pay rolls and

we intended to continue to do that. I didn't know (whether we could or not)—they couldn't tell me. We were making it our business to know if we could continue to meet our pay roll. * * * I told you that we proposed to know if we could meet our obligations, and when they could tell us what our obligations were, we could tell them 'yes' or 'no.' I wanted to know before what I was going to sign."

It was contended at all times by the company that the miners would not work after April 1 unless it signed the independent contract, which it refused to do because it was not clear as to what its obligations thereunder would be. On the other hand, it is contended by the miners that the company withdrew from the association and immediately removed its mining machinery from the face to the partings, closed down five of its eight boilers, and told them, when they appeared at the mine for work on April 2, that there would be no work until further notice; that they were ready and willing to work and that the cessation of work was not due to a labor dispute.

There seems to be no doubt but that the company was asked to sign the independent agreement after it withdrew from the association, but the question is, was the stoppage of work occasioned by that request and did a labor dispute actually exist? The board member was of the opinion that the company was bound by the terms of the supplemental agreement whether they signed it or not. Plans had evidently been made by the company to cease working, temporarily at least, prior to the request.

The evidence on some of the points is conflicting, but the record clearly indicates that there was no labor dispute which caused the stoppage of work. The evidence shows that the company, feeling insecure under the then governmental price regulations did not care to gamble on the future outcome of conditions and its ability to continue meeting its pay roll. The statements of its president are clearly to that effect. There was no dispute concerning

hours or terms of employment about which the parties were trying to agree. The trouble was the uncertainty of prices and conditions under the prevailing economic setup which caused the company to fear the future and to retire behind closed doors rather than to continue operation and take the chance of failure.

It was shown that the mine was not in condition to operate on April 2; that the miners appeared for work that morning; that the machinery had been moved from the place of operation during the preceding afternoon and night and that of the eight boilers usually employed all were down but three. The company attempted to explain this situation by saying that the examiners had refused to make the examination required before work can begin. Examinations begin at midnight prior to the day's work. There was no attempt to arrange with these men for any examination until after the noon hour the preceding day. At noon of that day the removing of most of the machinery from the face had already begun, and it continued for a period of sixteen hours until completed. The company's position that the stoppage of work resulted because examinations had not been made is inconsistent with its undisputed actions. A number of the mine bosses were qualified to make the examinations and, although not customarily used for that purpose, the company did not request them to serve in that capacity.

One of the regular examiners was away because of sickness; another was papering his house and refused to go unless the board member so advised, and two others said they were advised through the board member's office not to work. The board member testified positively that he had told no one not to work, nor had he authorized anyone else to give any such order on his behalf or on behalf of the union.

The mine president and the superintendent testified that the board member told them there would be no work unless

the independent contract was signed. This is denied and explained by the board member wherein he says he told them that if the mine could not pay the men or the men did not know what they were going to be paid, they might not want to work. He said: "I did not tell him the union wouldn't let the men work at the mine not getting the retroactive pay because on Tuesday, April 2nd I went out to the mine and I was informed out there by the company that they wasn't going to operate * * *. I did not know that the examiners had not examined that mine the night before and I was not told that on my arrival. The only thing I was told was that the bosses had worked and pulled the machinery out from the other side. I do not know why the examiners did not work."

The board member learned through his official capacity, about June 19 or 20, that the mine president thought he was going to be allowed thirty-five cents a ton, and if he got that much he would go along and start the mine. The mine did resume operations within a few days thereafter and the company went back into the association. It was testified by the board member that about three days before the mine resumed operations he and the mine president were in conference and the former made request that some donation be made by the latter to the employees. Wasson, the company president, replied that he would have gone broke operating. He also said in substance to Johnson and others that the mine was going to work for three months, that he was going away, and that when he came back, if the books were in the red, the thing would be overwith anyway. He said he'd shut it down, that it would be overwith.

Appellees contend that where a contract between employer and employee has been terminated by one of them, no contract then exists and the employer is under no obligation to operate and the employees are under no obligation to work. They cite *U. S. Coal Co.* v. *Unemployment Board*, 66 Ohio App. 329, 32 N.E. 2d 763. We need not

decide that point. As heretofore indicated it appears that the company desired at least a temporary cessation from operation until coal prices should become stabilized, because it feared the consequences of continued operation under conditions as they then existed. The fact that it had orders for coal does not change the situation, because, if it could not operate at a profit, the more coal produced the heavier would be the loss. In our opinion the company is urging the contract matters as an excuse for the work stoppage, but such were not the real reasons therefor. Many of the facts shown by the record occurred subsequent to the stoppage of work and have their existence only because of that stoppage.

The manifest weight of the evidence is with the appellees. The record here establishes that the company withdrew from the association without assigning any reason therefor; that very soon thereafter it began removing machinery from the face to the partings and continued so to do for an uninterrupted period of sixteen hours; that it shut down all boilers but three; that when the miners appeared for work on April 2 they were told by the company there would be no work until further notice; that substantially the same statement was made to the board member when he appeared at the mine that morning; that the miners were ready and willing to work; that none of the employees had been told by the board member or any one in authority that they should not work; that the company feared the outcome of operating under the then present conditions; that after the company had learned or had reason to believe it would get thirty-five cents a ton for the coal, the mine resumed operations and the company went back into the association; that there was no labor dispute to be settled and none was settled as the result of which the company resumed operations. We hold that the unemployment was not due to a stoppage of work which existed because of a labor dispute.

As a guide to the interpretation of the Unemployment Compensation Act the legislature has declared the public policy of the State and has said that economic insecurity due to involuntary unemployment has become a serious menace to the health, safety, morals and welfare of the people of the State of Illinois. Ill. Rev. Stat. 1947, chap. 48, par. 217, sec. 1.

As a protection to the fund accumulated under the act, section 7(d) provides that no benefits shall be paid if the unemployment is due to a stoppage of work which exists because of a labor dispute, etc. If the stoppage of work did not exist because of a labor dispute benefits are payable in this case. The act must be liberally construed to the end that provision be made for unfortunate persons out of employment. *American Medical Association* v. *Board of Review of the Department of Labor*, 392 Ill. 614; *Zehender & Factor, Inc.* v. *Murphy*, 386 Ill. 258.

The appellant cites *Fash* v. *Gordon*, 398 Ill. 210, *Local Union No. 11* v. *Gordon*, 396 Ill. 293, and *Walgreen Co.* v. *Murphy*, 386 Ill. 32, as authority that where the unemployment is due to a stoppage of work which exists because of a labor dispute it is not compensable. We are in accord with the holdings in those cases, but the facts in each of them are such as to render them inapplicable here.

Appellant argues that a labor dispute may exist even though the contract of employment has expired, and cite a number of cases so holding, including several from foreign jurisdictions. In the case before us there was no labor dispute, and therefore the cases cited by appellant on that point are likewise inapplicable.

In our opinion the decision of the Director of Labor was contrary to the manifest weight of the evidence and the circuit court was right in overruling that decision. The order of the circuit court is affirmed.

*Order affirmed.*