KANSAS CITY STAR COMPANY, Respondent, v. DEPART-
MENT OF INDUSTRY, LABOR & HUMAN RELATIONS and
others, Appellants.

*No. 259. Argued September 5, 1973.—Decided October 30, 1973.
Motion for rehearing denied May 8, 1974.*

(Reported in 60 Wis. 2d 591, 211 N. W. 2d 488, and
217 N. W. 2d 666.)

For the appellants there were briefs by *Uclair W.
Brandt*, Department of Industry, Labor & Human Rela-
tions chief counsel, attorney; and *Goldberg, Previant &
Uelmen* and *Albert J. Goldberg* of counsel, attorneys for
William A. Abel, et al., all of Milwaukee.

For the respondent there were briefs by *Carroll E.
Metzner, Roger L. Gierhart,* and *Aberg, Bell, Blake &
Metzner,* all of Madison, and *Allan L. Bioff, Leonard
Singer,* and *Watson, Ess, Marshall & Enggas,* all of Kan-
sas City, Missouri.

The following opinion was filed May 8, 1974.

PER CURIAM *(on motion for rehearing).* The employ-
ment contract did not spell out the terms of the right of

the union to withdraw its termination notice, nor the existence of a right of the union to reinstate that notice prior to the ending date of the contract. In the absence of a specific provision in the contract as to the right to withdraw a termination notice, the department found that the union withdrew its termination notice and the department further found that as to the subsequent lay-offs there was then no bona fide labor dispute in progress. These findings were supported by credible evidence as discussed in our original opinion.

We do not reach the question now raised for the first time by the employer asserting estoppel as to either the "department" or the union. Estoppel was not asserted before the department nor was there any point made of it either in the record before the department or in the trial court.

ROBERT W. HANSEN, J. *(concurring in denial of motion for rehearing).* In *A. J. Sweet, Inc. v. Industrial Comm.* (1962), 16 Wis. 2d 98, 114 N. W. 2d 141, 114 N. W. 2d 853, this court considered whether a loss of work by claimant employees due to lockout or plant shutdown by an employer constituted a bona fide labor dispute under sec. 108.04 (10) of the Wisconsin Unemployment Compensation Act. On the issue of whether a labor dispute was bona fide within the meaning of the statute, this court in *Sweet* held that ". . . resolving this issue involves the construction of the agreement between the parties . . . ." *(Id.* at page 105.) In *Sweet,* this court found that the collective bargaining contracts between the parties ". . . contained no express language prohibiting either strikes or lockouts during their term. . . ." *(Id.* at page 106.) The court held that the contracts contained no express provision or implied promise that ". . . the employers would not utilize the device of a lockout . . . ." *(Id.* at page 110.) It necessarily fol-

lowed, the court concluded, that the claimant employees' loss of time from work was ". . . due to a bona fide labor dispute within the meaning of sec. 108.04 (10), Stats." (*Id.* at page 110.) In the case before us, the existing agreement between employer and employees expressly provided that: "The Company agrees that there will be no lockouts during the period of this Agreement." (labor agreement, page 20.) The employees' organization had filed, pursuant to the agreement, a termination of agreement notice. Subsequently and prior to the lockout, the labor group withdrew that notice, stating: "In light of President Nixon's ninety day freeze on wages and prices, this letter will serve as a withdrawal of that termination notice and of our desire to continue to work under the terms of the existing agreement, . . ." until a new agreement was reached or new termination notice sent. Under the ruling in *Sweet*, the writer would on this set of facts hold that claimant employees' loss of time from work for which they seek unemployment benefits was not due to a bona fide labor dispute within the meaning of sec. 108.04 (10), Stats. Where the claimant employees had clearly indicated their willingness to continue work under the existing agreement, the writer would further hold that the labor dispute was not "in active progress" within the meaning of sec. 108.04 (10). The employer here notified the claimant employees: "The entire mill will be shut down effective no later than the end of the last shift on September 3, 1971, and until further notice." Whether this notice and shutdown is considered, as it was in the concurring opinion, as a permanent closing down of operations, or, as it has been here, as a temporary lockout, it does not under the facts here constitute what the statute requires for disqualification from benefits of employees who have lost time from work due to a lockout precipitated by a bona fide labor dispute that was *in active progress.*

CONNOR T. HANSEN, J. *(dissenting from denial of motion for rehearing).* The Kansas City Star Company, Flambeau Paper Company Division, respondent, has filed a motion for rehearing. For the reasons hereinafter set forth, Mr. Justice BEILFUSS, Mr. Justice HANLEY, and the writer would grant the motion for a rehearing.

The majority opinion correctly holds that "bona fide labor dispute," as the term is used in sec. 108.04 (10), Stats., means a controversy regarding the terms of employment which in fact exists and is not merely pretextual or feigned on the part of an employer in an attempt to avoid his obligations under the Unemployment Compensation Act. However, the facts of this case clearly support the trial court's conclusion that these employees lost their employment as a result of a bona fide labor dispute.

Sec. 1 (b) of the collective bargaining agreement provides:

"(b)  If either party shall desire to change any provision of this agreement, it shall give written notice of such desire to the other party at least sixty (60) days in advance of any anniversary date."

Both unions gave the requisite notice to the employer by letters on May 10 and May 12, 1971, that certain contract provisions should be renegotiated. Bargaining sessions were conducted on June 11, 1971, and intermittently thereafter for approximately six weeks. The unions sought increased wages and changes in fringe benefits such as pensions, vacations and group insurance. The employer sought changes in certain work rules, wage differentials and contract language.

The parties were unable to agree and a "bona fide labor dispute" [1] between the parties existed.

An impassé was reached between the parties on July 23d. On July 27th, the union notified the employer that

---

[1] *See:* Secs. 103.62, 111.02, 111.70 (1) (i), and 111.81 (8), Stats., for definitions of a labor dispute.

the members had agreed to strike by a vote of 291 to 19. Pursuant to section 2 of the collective bargaining agreement, and on August 5th, both unions tendered termination notices, effective in thirty days in accordance with their contracts. At the same time the unions advised the employer that they would be willing to meet to resolve differences any time during the thirty-day period.

Because of the nature of the chemicals and machinery used by the employer in its operations, a sudden walkout by employees during full production would have caused extensive damage to facilities and materials. Therefore, the employer immediately began to wind down its operations. Customers and material suppliers were notified and, naturally, a drastic decline in new orders for paper goods was soon evident.

On August 15th, the President of the United States asked for a ninety-day wage and price freeze and four days later, on August 19th, the employer received the following letter from the unions:

"In light of President Nixon's ninety day freeze on wages and prices, this letter will serve as a withdrawal of that termination notice and of our desire to continue to work under the terms of the existing agreement, *unless, or until, a new termination is sent* or full agreement reached on a new contract." (Emphasis supplied.)

Somehow the commission and the majority opinion of this court interpret this withdrawal of termination notice as the end of the labor dispute. The fact is, it was not. A "bona fide labor dispute" existed before the termination notice was served and continued to exist after the purported withdrawal and continued until a new collective bargaining agreement was finally entered into between the parties in December, 1971.

All that the August 5th letter from the unions purported to accomplish was to withdraw the strike notice for the ninety-day wage freeze and until the unions sent

a new thirty-day termination notice in the event an agreement was not reached on a new contract.

The employer refused to accept this attempted withdrawal of termination notice by the unions because the collective bargaining agreements did not provide for such a withdrawal of the termination notice, and because it had already begun to wind down its operations and if full operations were resumed the unions could, at some impropitious moment, issue a new notice of termination. Also, without what were believed to be adequate assurances that the employees would continue on the job, the employer could not serve its customers as a reliable source of supply. The commission, in support of its conclusion that the employees did not lose their employment because of a bona fide labor dispute, found that ". . . the good faith efforts by the unions to continue the contracts required the employer to accept the withdrawal notice even though the contract is silent as to the unions' right to withdraw the termination notices," notwithstanding other facts. This finding of fact by the commission, alone, is evidence of a labor dispute. Also, the commission held that ". . . the employer's actions in continuing to 'wind down' its business operations . . . were not required, necessary or warranted business decisions, . . ." and the attendant loss of work by these employees was ". . . solely because of economic worries over the preservation of its relations with its suppliers and its customers [and that] this was a business judgment and did not constitute a 'bona fide labor dispute' as contemplated by section 108.04 (10)."

Undeniably, the decision to continue to wind down operations was a business judgment as, indeed, is every decision that an employer or a union makes with respect to its respective operations during a period such as this. However, an employer has the right, when confronted with a labor controversy, to evaluate his position in view

of union demands and act in accordance with his best judgment without being penalized by enforcement of the provisions of the Unemployment Compensation Act. If, in fact, the actions of the employer or a union constitute an unfair labor practice, sanctions exist in a different forum. The commission is not empowered to weigh the merits of the various positions taken by the parties in a labor controversy such as this. To do so violates the spirit and intent of sec. 108.04 (10), Stats. The purpose of this section ". . . is to preserve the *status quo* during the course of the labor dispute so that at its cessation the parties thereto stand in the same relation to each other as at its beginning in so far as payments of benefits under the act are concerned." *Marathon Electric Mfg. Corp. v. Industrial Comm.* (1955), 269 Wis. 394, 408, 69 N. W. 2d 573, 70 N. W. 2d 576. The commission itself recognized in *Marathon, supra,* page 405, that the " '[p]resent law takes a "hands off" approach. *It stays neutral.* It does not require that the administrative agency determine the merits of the labor dispute. . . .' " The commission's ruling in this case violated this mandate of "neutrality" and, in effect, required the employer to contribute financial support to this labor dispute. If such a change is to be made in the law, it is the duty and concern of the legislature.

The two-member majority of the commission relied on *Barrett v. Wasson Coal Co.* (1949), 404 Ill. 11, 87 N. E. 2d 769, as authority to support their conclusion. In *Barrett, supra,* page 17, the operations of a coal mine ceased because the owner was losing money on it and the court held that the employees were not laid off because of a labor dispute, explaining as follows:

". . . There was no dispute concerning hours or terms of employment about which the parties were trying to agree. The trouble was the uncertainty of prices and conditions under the prevailing economic setup [govern-

ment regulations] which caused the company to fear the future and to retire behind closed doors rather than to continue operation and take the chance of failure."

This paper plant was not closed because it was failing to generate a sufficient economic return or because of an uncertain market for its products.

A bona fide labor dispute *in fact* existed in this case both before and after the purported withdrawal of the termination notice. The dispute was not pretextual or feigned on the part of the employer.

We conclude as a matter of law that there was a bona fide labor dispute and would grant the motion for rehearing.